## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

Sue Kerecman,

      Plaintiff,

                                    Case No. C-2-04-00881
-V-                                  JUDGE SMITH
                                      Magistrate Judge Abel

Pactiv Corporation,

      Defendant.

## OPINION AND ORDER

Plaintiff, Sue Kerecman ("Kerecman") asserts claims of hostile work environment, and retaliation under Title VII of the Civil Rights Act of 1964 and Ohio Revised Code Sections 4112.02 and 4112.99. In addition, Ms. Kerecman asserts an Ohio common law claim of intentional infliction of emotional distress. This matter is before the Court on Defendant Pactiv Corporation's ("Pactiv") Motion for Summary Judgment (Doc 25). Based on the following, Defendant's Motion for Summary Judgment is **GRANTED**.

## I. FACTS

**A.**     **Defendant Pactiv**

Pactiv's Columbus, Ohio facility employs approximately 153 employees and relies on its approximately 76 forming operators to manufacture paper plates for its customers. The facility has 23 forming lines located in a large room approximately 200 feet by 250 feet. A forming

operator is assigned to each line and operates the machine during production.  As an equal

opportunity employer, Pactiv maintains policies prohibiting discrimination, sexual harassment

and retaliation. (*See* Pactiv's Hourly Employee Handbook EEO Harassment Policy, p. 45

(Kerecman Depo. at Ex. 14); Pactiv's Sexual Harassment Policy (Kerecman Depo. at Ex. 6)).

Kerecman received a copy of both policies. (Kerecman Depo. at 282-83, Ex. 21)  Pactiv's EEO

Harassment Policy states that an employee who believes he or she has been the subject of

unlawful harassment should report the alleged act immediately to the Facility Manager, his or

her supervisor, his or her employee relation's manager, or to the Corporate hotline. (Kerecman

Depo. at Exs. 6, 14).

To ensure a safe and positive work environment for its employees, Pactiv also maintains

Standards of Conduct within the workplace which employees are required to follow.  Standards

of Conduct No. 6 prohibits "the making of obscene or abusive remarks on Company time,

Company property, or Company business."  (Kerecman Depo. at Ex. 14 at 23).  For safety

reasons, Pactiv also requires employees to wear proper eye and ear protection while on the floor

in production areas. (Kerecman Depo. at 162-63; Caniglia Decl. ¶ 6; Pactiv's Standards of

Conduct No. 13, p. 24, and Plant Safety Rule No. 2, p. 11 contained in the Employee Handbook

and *see* Kerecman Depo. at Ex. 14). Pactiv posts notices of this safety requirement in the plant.

(Kerecman Depo. at 162-63).

**B.      Plaintiff Kerecman**

 Plaintiff, Sue Kerecman, is a female who currently resides in Westerville, Ohio.

Plaintiff was hired by Defendant Pactiv on March 7, 1994, as a forming operator.  Plaintiff

Kerecman works the third shift from 12 a.m. to 8 a.m. and operates one of the forming lines

which includes such duties as taking care of the machine, checking trays and packing trays into boxes.

Plaintiff Kerecman has had a history of discipline for violating work rules.  From 1996-1998, Ms. Kerecman received three write ups for poor attendance: oral warnings on September 9, 1996 and July 31, 1998 and a written warning on November 23, 1998. (Kerecman Depo. at 272-73, Ex. 15). On July 30, 1998, Defendant Pactiv had a "conversation" with Ms. Kerecman for swearing at another employee. (Kerecman Depo. at 273-75, Ex. 16).  On June 22, 2000, Ms. Kerecman received a step 2 "written consultation" for a safety violation that resulted in equipment damage. (Kerecman Depo. at 275-76, Ex. 17).  On February 6, 2002, Ms. Kerecman received a step 2 "letter of reprimand without suspension" for throwing a package of a product at a co-worker on January 30, 2002. (Kerecman Depo. at 277, Ex. 18).  Finally, on January 6, 2003, Ms. Kerecman was counseled about the importance of plant safety when she struck her knee against the hopper on two occasions. (Kerecman Depo. at 278, Ex. 19).

Ms. Kerecman testified that beginning in the fall of 2002 and continuing until January, 2003, John Watkins, a co-worker who works as a forming operator, asked her out almost every night even though she consistently told him no. (Kerecman Depo. at 92).  Ms. Kerecman admits that she did not speak to anyone in management about this until after the January, 2003 cornering incident. (Kerecman Depo. at 93-95).  In January, 2003, Ms. Kerecman testified that Mr. Watkins cornered her and again asked her to go out with him. (Kerecman Depo. at 63, 65).  When Ms. Kerecman tried to go around him, he put is right hand on her left arm to stop her.  *Id*.  Ms. Kerecman than ran out from around him the other way and went straight into the product office. *Id*.  Ms. Kerecman told Mike Diaz that she did not want to be put anywhere near Mr.

3

Watkins for the rest of the night.  *Id.* at 63.  Ms. Kerecman's wishes were accommodated. *Id*. at

68.  In addition, Ron Poe, the supervisor, came out of his office and asked Ms. Kerecman about

the incident. *Id.*  Mr. Poe then went and spoke with Mr. Watkins and reported back to Ms.

Kerecman that she would be left alone.  *Id*.  Ms. Kerecman admits that Mr. Watkins did, in fact,

stop asking her out and "basically stopped talking to" her after this incident. *Id.* at 93.

 After the cornering incident in January, 2003, but sometime before April 29, 2003, Ms.

Kerecman testified that Mr. Watkins would stare at her. *Id*. at 82.  Also during this time, on one

occasion, Ms. Kerecman and Mr. Watkins were working together on the same machine and she

would have to hand Mr. Watkins the trays and he would put them in a plastic folder. *Id*.  Ms.

Kerecman testified that he grabbed the trays from her and slammed them into the plastic bag and

this upset her. *Id*. at 82-83.  Ms. Kerecman responded to Mr. Watkins's behavior by telling the

supervisor that she wanted him moved to another line. *Id*. at 83-84.  The supervisor immediately

accommodated Ms. Kerecman's wishes and Mr. Watkins was moved. *Id*. at 84.  Ms. Kerecman

testified that after Mr. Watkins was moved, Mr. Nappier told her that Mr. Watkins had told him

that he would come back and hurt Ms. Kerecman if he lost his job. *Id*. at 71-73.  Ms. Kerecman

admits she did not immediately report this alleged threat to management. *Id*. at 73.

**C.    Defendant Pactiv's Investigation**

 On or about April 29, 2003, a number of female employees, including Kerecman, Karen

Carey, Becky Bird, DeAngela Jackson and Kuemar Parker, met with Shift Supervisor Joe

Deffenbaugh at the beginning of the third shift to complain about Mr. Watkins.  Each of the

women had different complaints about Mr. Watkins. Ms. Kerecman complained that Mr.

Watkins: (1) had repeatedly asked her out on dates after she had declined; (2) cornered her; (3)

4

intimidated her claiming he would "hurt" her; and (4) followed another employee, Becky Bird home. (Compl. ¶ 8; Kerecman Depo. at 55, 57, 58).

Defendant Pactiv immediately began an investigation into the complaints made by the employees. Between April 29 and May 2, 2003, Toni Caniglia, Human Resources Manager, interviewed a total of 12 employees including Kerecman, Bird, Parker, Jackson, Carey, Jeff Nappier, Otis Wade, Edie Asbury, Larry King, Matthew Dalton, Mike Burden and Watkins. (Compl. ¶ 9; Caniglia Decl. ¶¶ 1, 7, Ex. 1).

**1. Ms. Caniglia Meets With Kuemar Parker**

On April 29, 2003, Ms. Caniglia interviewed Parker, who subsequently signed a written statement. (Caniglia Decl. ¶ 8 and. Ex. 2). Parker told Caniglia that Watkins did ask her out, but she said, no, she was married. (Compl. ¶ 9 and Ex. 2 at Def.0606). Parker added, "He's not bothering me any more." (Caniglia Decl. Ex. 2 at Def.0606). In her deposition, Kerecman admitted she never heard Watkins ask out Parker. (Kerecman Depo. at 101).

**2. Caniglia Meets With DeAngela Jackson**

On April 29, 2003, Ms. Caniglia interviewed Jackson, who subsequently signed a written statement. (Caniglia Decl. ¶ 9 and Ex. 3). Jackson told Caniglia that Watkins had asked her out. "[A]t first he used to ask me out a lot but I kept telling him I wasn't looking for anyone." (Caniglia Decl. Ex. 3 at Def.0601). She said no and he kept asking even after she said no. (Caniglia Decl. Ex. 3 at Def.0601). "He doesn't ask me out so much anymore, but he knows I am not interested." (Caniglia Decl. Ex. 3 at Def.0601). She further stated, "[Watkins is] mean to me because I don't want to go out. … Once he pretended like he was going to throw something at me. I think he's doing hand gestures (don't know what) behind my back and when I turn

5

around he stops." (Caniglia Decl. Ex. 3 at Def.0602).  Ms. Kerecman admitted in her deposition that she has no personal knowledge of the allegations raised by Jackson. (Kerecman Depo. at 103).  Ms. Kerecman alleged in her Complaint that Watkins was "hateful" toward Jackson (Compl. ¶ 10), yet admits she has no evidence in support of her allegation. (Kerecman Depo. at 104).

### 3.    Caniglia Meets With Karen Carey

On April 30, 2003, Caniglia interviewed Carey, who subsequently signed a written statement. (Caniglia Decl. ¶ 10 and Ex. 4 at Def.0612).  Carey told Caniglia: "I've been hearing things from the girls. I haven't heard or been witness to anything in particular myself, but I think you should talk to them. They're having troubles with John [Watkins]." (Caniglia Decl. Ex. 4 at Def.0612).

### 4.    Caniglia Meets with Kerecman

On May 1, 2003, Caniglia interviewed Ms. Kerecman, who subsequently signed a written statement. (Kerecman Depo. at 18, 19, 27, Ex. 1).  Caniglia asked Ms. Kerecman about Watkins asking her out on dates.  Ms. Kerecman stated that "[Watkins] kept asking me out for coffee or breakfast or to ride his motorcycle." (Kerecman Depo. at 19, 92-93, Ex. 1 at Def.0438-40).  Ms. Kerecman said he continued asking even after she said no. "I told him no that I didn't date anyone from work." *Id*. Ms. Kerecman stated that Watkins would ask her "every night" and she kept telling him "no." *Id*.  Ms. Kerecman said she went to Brenda Robinson, a co-worker, to ask what she should do about Watkins. (Kerecman Depo. at 19, 93-95, Ex. 1 at Def.0438-40).  Ms. Kerecman stated she does not date black men. (Kerecman Depo. at 19, 93, 94, Ex. 1 at Def.0438-40).  Robinson told her to tell him "no." (Caniglia Decl. ¶ 11 and Ex. 5 at Def.0745).   Ms.

Kerecman admitted Watkins stopped asking her out after January, 2003. (Kerecman Depo. at 62, 92-94, 142).  Ms. Kerecman admitted that at the time Watkins asked her out, she did not complain to Pactiv. (Kerecman Depo. at 93, 94).

Ms. Kerecman told Caniglia that Watkins was generally leaving her alone, "except for staring at [her]." (Kerecman Depo. at 19, Ex. 1 at Def.0438-40).  Ms. Kerecman reported that Watkins "stares at [her] a lot." (Kerecman Depo. at 19, 82, Ex. 1 at Def.0438-40). "He slams the trays down when he's packing." *Id.* "It's nerve-wracking and upsets me." *Id.*  Ms. Kerecman added, she "told the day shift supervisor [John Fannin] to move [Watkins] because [she] was uncomfortable, so he did. John [Watkins] wasn't doing anything, I was just uncomfortable with him on my line." (Kerecman Depo. at 19, Ex. 1 at Def.0438-40; Caniglia Decl. ¶ 12).  Per Ms. Kerecman's request, Pactiv immediately moved Watkins to another part of the plant floor. (Kerecman Depo. at 19, 83, 84, 86, Ex. 1 at Def.043840; Caniglia Decl. ¶ 12).

Kerecman also reported to Caniglia that Watkins had "cornered" her:

> One night when I relieved him for break, he cornered me. He wasn't saying anything in particular, but I felt trapped. I was scared and nervous. I got away from him and told Mike Diaz [Third Shift Coordinator for Hourly Employees] what happened. I told Mike [Diaz] not to put me there with John [Watkins].  Mike [Diaz] told Ron Poe [Third Shift Supervisor, who left the Company on February 10, 2003]. Ron talked to John [Watkins]. John [Watkins] hasn't talked to me or bothered me since then.

(Kerecman Depo. at 19, 62, 63, 77, 78, Ex. 1 at Def.0438-40; Caniglia Decl. ¶ 13).  Later, in October, 2003, when Caniglia met with Kerecman to discuss this incident again, Ms. Kerecman changed her version of this incident and said Watkins had put his hand on her shoulder and it made her feel uncomfortable; Ms. Kerecman did not report in May, 2003 that Watkins had put his hand on her. (Kerecman Depo. at  62, 63, 68, 69, Ex. 1 at Def.0441-42).

Ms. Kerecman also told Caniglia in the May 1, 2003 interview that Jeff Nappier had told her that Watkins had threatened her by saying he would come back and hurt her if he lost his job. (Kerecman Depo. at Ex. 1 at Def.0439).  Ms. Kerecman admitted at her deposition that this alleged threat was made before her April 29, 2003 meeting with Shift Supervisor Deffenbaugh and, after that time, Watkins had not made any other threats. (Kerecman Depo. at 72, 73, Ex. 1 at Def.0439).  Ms. Kerecman further admitted she did not immediately report this alleged threat to Pactiv when it was reported to her. (Kerecman Depo. at 73, Ex. 1 at Def.0439). She also did not report this threat to Deffenbaugh during their meeting on April 29, 2003. *See id*.  Ms. Kerecman also told Caniglia that "Jeff [Nappier] told me that John [Watkins] had followed Becky Bird home." (Kerecman Depo. at 19, 88, Ex. 1 at Def.0438-40).  Although Ms. Kerecman admitted in her deposition she did not know when Watkins followed Bird home, she claimed this occurred before her April 29, 2003 meeting with Shift Supervisor Deffenbaugh. (Kerecman Depo. at 88, 89).

**5.    Caniglia Meets with Becky Bird**

On May 1, 2003, Caniglia interviewed Ms. Bird, who subsequently signed a written statement. (Caniglia Decl. ¶ 16 and Ex. 8). Bird told Caniglia that Watkins had "asked [her] out many times, and I've told him I'm not interested." (Caniglia Decl. Ex. 8 at Def.0598).  "He continues to ask me things like 'do I want to go for a ride on his motorcycle,' but he says it in a way that is suggestive and he doesn't mean motorcycle. I tell him no, I'm not interested." (Caniglia Decl. Ex. 8 at Def.0598-0600).  These incidents occurred before their May 1, 2003 meeting, but Bird could not specify exactly when these incidents allegedly occurred.  (Caniglia Decl. Ex. 8 at Def.0598-0599).

8

Ms. Bird further reported to Caniglia that Watkins was once talking to Larry King and Jeff Nappier and he grabbed his crotch and said, "suck this, mother f--ker" in Bird's presence. (Caniglia Decl. Ex. 8 at Def.0598). Bird admitted that he "doesn't say it to me" and that the comment was not directed toward her. (Caniglia Decl. Ex. 8 at Def.0598). Finally, Bird told Caniglia that Ms. Kerecman told her that Watkins had followed her (Bird) home from work although Bird admits she has no personal knowledge of Watkins following her home. (Caniglia Decl. Ex. 8 at Def.0599).

6.    **Caniglia Meets With Jeff Nappier**

On May 1, 2003, Caniglia interviewed Mr. Nappier, who subsequently signed a written statement. (Caniglia Decl. ¶ 17 and Ex. 9 at Def.0630-33).  Nappier told Caniglia he had not witnessed any of the events alleged by Ms. Kerecman. (Caniglia Decl. Ex. 9 at Def.0630-31).  With respect to the allegation that Watkins followed Bird home, Nappier stated that Watkins once gave him a ride home. (Caniglia Decl. Ex. 9 at Def.0630-31). Nappier told Caniglia he lives near Bird. (Caniglia Decl. Ex. 9 at Def.0630-31).  When Watkins drove Nappier home, they saw Bird turn off towards her home, and Watkins made the comment, "Oh, she lives this way?"  Other than that, he's [Watkins] never asked me anything about her or her house or anything." (Caniglia Decl. Ex. 9 at Def.0630-31).  Nappier said they were not following Bird home. (Caniglia Decl. Ex. 9 at Def.0630-31).

Nappier also told Caniglia he has never seen Watkins make any inappropriate gestures "like grabbing his crotch or him saying inappropriate things -- swearing or such." (Caniglia Decl. Ex. 9 at Def.0630-31).  Nappier further stated to Caniglia that Ms. Kerecman had confided in him that after they moved Watkins, "she has said that she doesn't have any problems with him

anymore." (Caniglia Decl. Ex. 9 at Def.0630-31).

Nappier denied ever telling Ms. Kerecman that Watkins made the comment that he would come back to hurt her or that he had heard him make this comment. (Caniglia Decl. Ex. 9 at Def.0630-31).  Instead, Nappier said Ms. Kerecman had asked him whether he thought Watkins would come back to hurt her to which Nappier responded, "John [Watkins] is not that way." (Caniglia Decl. Ex. 9 at Def.0630-31).

### 7.    Caniglia Meets with Larry King

On May 1, 2003, Caniglia interviewed Mr. King, who subsequently signed a written statement. (Caniglia Decl. ¶ 18, Ex. 10 at Def.0604-05).  King stated that while Watkins and Ms. Kerecman may have had a problem, any problems "had been resolved." *Id*. After Watkins was moved to a different line, "things seem[] quiet." *Id*. King stated he had never seen "any inappropriate behavior, like gestures or language" by Watkins. *Id*.

### 8.    Caniglia Meets with Otis Wade

On May 1, 2003, Mr. Wade told Caniglia he had not seen or heard anything relating to Watkins and felt Watkins was being falsely accused. (Caniglia Decl. ¶ 19, Ex. 1 at Def.0764-65). He told Caniglia that he avoids the "girls" and does not "believe" them. (Caniglia Decl. Ex. 1 at Def.0764-65).

### 9.    Caniglia Meets With Karen Carey Again

On May 1, 2003, Caniglia met with Ms. Carey a second time. (Caniglia Decl. ¶ 20; and Ex. 4 at Def.0612-0620).  Carey told Caniglia that Watkins had asked her out 4-5 times. (Caniglia Decl. Ex. 4 at Def.0612).  Carey did not specify when Watkins allegedly asked her out on dates. (Caniglia Decl. ¶ 20).  "I told him no, then he left me alone after 5 times of saying No!"

10

(Caniglia Decl. Ex. 4 at Def.0612).  Carey reported that Watkins would sometimes ask Carey to go on a motorcycle ride. (Caniglia Decl. Ex. 4 at Def.0612).  Ms. Carey declined.  During orientation, Carey stated that Watkins asked her who the single girls were. (Caniglia Decl. Ex. 4 at Def.0613). Carey also stated that DeAngela Jackson and Kuemar Parker came to Carey and told her Watkins had asked them out on dates. (Caniglia Decl. Ex. 4 at Def.0613).  Carey said she only heard rumors that Watkins had cornered Ms. Kerecman on the line one day and kept asking her out. (Caniglia Decl. Ex. 4 at Def.0613). Carey could not recall who told her this. *Id.*

Carey reported that she heard rumors that Watkins had grabbed his "crotch." (Caniglia Decl. Ex. 4 at Def.0613).  Ms. Carey stated that Kuemar Parker and DeAngela Jackson had told her that Watkins would grab his crotch. (Caniglia Decl. Ex. 4 at Def.0613).  Carey admitted that she never personally saw Watkins make any inappropriate gestures. (Caniglia Decl. Ex. 4 at Def.0614). Finally, Carey told Caniglia that someone had "keyed [her] truck," but that she did not know who had done it. (Caniglia Decl. Ex. 4 at Def.0614).  Carey further admitted that sometimes she makes sexual jokes at work, but not with Watkins. (Caniglia Decl. Ex. 4 at Def.0614-15).

On May 2, 2003, Karen Carey approached Caniglia and told her she wanted to clarify the last statement she gave to Caniglia. (Caniglia Decl. ¶ 21 and Ex. 4 at Def.0615).  Ms. Carey stated she does not joke around with Watkins, but only with her friends Larry King and Mike D. (last name unknown) in maintenance. (Caniglia Decl. Ex. 4 at Def.0615). Carey later told Caniglia, in October, 2003, that after Watkins was moved to a different shift on September 1, 2003, "things have been fine." (Caniglia Decl. Ex. 4 at Def.0618).

**10.    Caniglia Meets With Edie Asbury**

11

On May 1, 2003, Caniglia met with Ms. Asbury. (Caniglia Decl. ¶ 22, Ex. 1 at Def.0766).
Asbury stated that she did not have any problems with Watkins and she thinks girls are "stirring
it up." (Caniglia Decl. Ex. 1 at Def.0766). Ms. Asbury told Caniglia she is friends with Becky
Bird. (Caniglia Decl. Ex. 1 at Def.0766). Bird had confided in Asbury that she was worried
because Ms. Kerecman told Bird that Watkins had followed Bird home. (Caniglia Decl. Ex. 1
at Def.0766).  Bird told Asbury she was worried when Watkins asked her how many bedrooms
she had at her place. (Caniglia Decl. Ex. 1 at Def.0766).  In response, Asbury told Bird, "Becky,
you've been talking with everyone about your new place, and we've all been asking you
questions about it . . . he was just asking a question." (Caniglia Decl. Ex. 1 at Def.0766).  Asbury
said she has never heard Watkins use foul language or make any gestures. (Caniglia Decl. Ex. 1
at Def.0766).  When Watkins used to ask her out, Asbury said no. (Caniglia Decl. Ex. 1 at
Def.0766).

**11.    Caniglia Meets with Matthew Dalton and Mike Burden**

On May 2, 2003, Caniglia interviewed Mr. Dalton. (Caniglia Decl. ¶ 23,  Ex. 1 at
Def.0766-67).  Dalton said he had not seen Watkins make any obscene gestures or use foul or
abusive language. (Caniglia Decl. Ex. 1 at Def.0766).

On May 2, 2003, Caniglia interviewed Mr. Burden, who subsequently signed a written
statement. (Caniglia Decl. ¶ 24, Ex. 11 at Def.0610-11). Burden told Caniglia: "A while back I
had heard some rumors, and I told John [Watkins] once that No means No.  I was kind of joking
with him, because I hadn't heard or seen anything." (Caniglia Decl. Ex. 11 at Def.0610).  He has
never seen Watkins make any obscene gestures or heard any comments. *See id*.

**12.    Caniglia Meets with John Watkins**

12

On May 2, 2003, Caniglia met with Mr. Watkins, who subsequently signed a written statement. (Caniglia Decl. ¶ 25. Ex. 12 at Def.0634-39).  Watkins admitted asking out Ms. Kerecman. (Caniglia Decl. Ex. 12 at Def.0634).  After she said no, Watkins said he did not ask her again. *See id.* Watkins denied asking out any other employee. (Caniglia Decl. Ex. 12 at Def.0634).  Watkins stated, however, that he never asked Ms. Kerecman to go for a ride on his motorcycle or to go to breakfast or coffee. (Caniglia Decl. Ex. 12 at Def.0634). Mr. Watkins said he talks to Kuemar Parker about motorcycles. (Caniglia Decl. Ex. 12 at Def.0634).

Watkins denied following Bird home from work. (Caniglia Decl. Ex. 12 at Def.0634-35). He said on one occasion he gave his co-worker, Nappier, a ride home. *See id.*  Nappier lives off the same road as Bird. *See id*.  They saw her turn off the road and he continued around her.  *See id*.  Watkins then asked Nappier if she lives down that way and Nappier said yes. *See id.* Watkins denied keying Carey's car, denied threatening anyone, denied staring at Ms. Kerecman or doing anything else that might upset her. (Caniglia Decl. Ex. 12 at Def.0635). Watkins further denied making any obscene gestures such as grabbing his crotch or using foul language around the female employees. (Caniglia Decl. Ex. 12 at Def.0635).

### 13.    Caniglia Concludes Her Investigation and Reports Her Findings

After completing her investigation, Caniglia met with Watkins on May 13, 2003. (Caniglia Decl. ¶ 26; Caniglia Decl. Ex. 12 at Def.0636; Caniglia Decl. Ex. 13 at Def.0695-96). Caniglia warned Watkins about asking out other employees even after they had declined. (Caniglia Decl. Ex. 13 at Def.0695-96). Caniglia told Watkins this behavior was inappropriate and must stop immediately. (Caniglia Decl. Ex. 13 at Def.0695-96).  Ms. Caniglia also reviewed Pactiv's sexual harassment and non-retaliation policies with him. (Caniglia Decl. Ex. 13 at

Def.0695-96).  Specifically, Caniglia told Watkins the following: (1) Pactiv has a zero tolerance policy; (2) employees who believe they are being harassed have a responsibility to report this to Pactiv; (3) Pactiv will investigate and take appropriate corrective action; and (4) Pactiv will not permit any retaliation. (Caniglia Decl. ¶ 26; Caniglia Decl. Ex. 13 at Def.0695-96).

Finally, Caniglia told Watkins he is expected to work together with his co-workers "professionally," to speak to any supervisor or her if he has any questions, and that a document would be placed in his file regarding their conversation. *See id*.

Caniglia then met with Ms. Kerecman on May 13, 2003. (Kerecman Depo. at 19, 20, 27, 28, 138, Ex. 1 at Def.0440; Caniglia Decl. ¶ 27, Ex. 14 at Def.0734).  Caniglia told Ms. Kerecman she had interviewed a total of 12 employees including Parker, Jackson and Carey. (Kerecman Depo. at 19, 20, 139; Caniglia Decl. Ex. 14 at Def.0734). Ms. Caniglia also told Ms. Kerecman she investigated her allegations relating to Watkins including: (1) Watkins following another employee home; (2) Watkins making obscene gestures and using obscene language; (3) Watkins making threats; and (4) Watkins asking ladies out even after they said no. (Kerecman Depo. at 19, 20, 139; Caniglia Decl. Ex. 14 at Def.0734).

Caniglia told Ms. Kerecman she had spoken with Watkins and with others who had been identified as "knowing" about the allegations. (Kerecman Depo. at 19, 20; Caniglia Decl. Ex. 14 at Def.0734).  Ms. Caniglia was unable to substantiate any of the first three allegations despite talking to the alleged witnesses. (Kerecman Depo. at 19, 20, 139-40, 144; Caniglia Decl. Ex. 14 at Def.0734).  With respect to the fourth, Ms. Caniglia stated she had reviewed Pactiv's sexual harassment policy with Watkins and warned him about asking out other co-workers and told him that "the behavior must stop immediately." (Kerecman Depo. at 19, 20, 142; Caniglia Decl. Ex.

14

14 at Def.0734). Caniglia also reviewed Pactiv's harassment policy with Ms. Kerecman. (Kerecman Depo. at 19, 20, 140; Caniglia Decl. Ex. 14 at Def.0734).

On May 14, 2003, Caniglia advised Ms. Bird of the results of the investigation. (Caniglia Decl. ¶ 28 and Ex. 8 at Def.0599). Bird told Caniglia that she was not having any problems at work and that, "Nothing's happening at work right now." (Caniglia Decl. Ex. 8 at Def.0599). With respect to the allegation that Watkins followed her home from work, Bird told Caniglia that she believed the rumors were true because Watkins asked her, "how many bedrooms were in [her] house." (Caniglia Decl. Ex. 8 at Def.0599).

Caniglia also met with the other witnesses who, with Ms. Kerecman, had approached shift supervisor Deffenbaugh about Watkins and shared the results of her investigation with them. (Caniglia Decl. ¶ 29). When Caniglia met with Parker on May 13, 2003, Parker stated she came forward initially because she relied on things Bird claimed to be fact that later were revealed to be only rumors. (Caniglia Decl. ¶ 30 and Ex. 2 at Def.0607).

After Caniglia completed her investigation, Ms. Kerecman expressed dissatisfaction with Pactiv's investigation. (Caniglia Decl. ¶ 31). On May 15, 2003, Ms. Kerecman told Caniglia that Nappier, who Caniglia had interviewed during the investigation, was lying to protect Watkins and that she (Ms. Kerecman) was working with the police. (Kerecman Depo. at 19, 20, 27, 28, Ex. 1 at Def.0440).

**G.     Pactiv Receives Complaints About Kerecman**

On May 15, 2003, Ms. Parker approached Caniglia to complain about Ms. Kerecman and Bird. (Caniglia Decl. ¶ 32, Ex. 2 at Def. 0607). Parker said she felt *used* by Kerecman and Bird who were "try[ing] to get [Watkins] in more trouble by presenting rumors [about him] as [true]."

*Id.* Parker further stated that Bird had been telling employees that Watkins had followed her home even though she had no personal knowledge of Watkins ever following her home. *See id*. Parker also said she was being pressured to change her story by Kerecman and Bird to get Watkins in trouble. (Caniglia Decl. Ex. 2 at Def.0607). Parker stated Watkins "does walk around and 'adjust himself,'" but she had not seen Watkins make any obscene gestures. (Caniglia Decl. Ex. 2 at Def.0607).

**H.      Watkins Complains He Was Being Harassed**

On June 2, 2003, Watkins complained to Human Resources Manager Toni Caniglia that *he* was being harassed: "[t]hose girls are harassing [him]" by making false accusations against him and constantly staring at him and keeping track of his breaks. (Caniglia Decl. ¶ 33 and Ex. 12 at Def.0636-37). Watkins stated that the previous night, Kerecman had told other employees that he (Watkins) was watching her. Watkins, however, claimed that Kerecman and Bird were "constantly watching [him], keeping track of his breaks and asking other people about [his] time." *Id*. Watkins said he saw Kerecman talking to someone in a sheriff's car in the parking lot. He also heard that Bird was taking self defense classes and was going to buy a guard dog because of Watkins and he was concerned that she was giving other employees a negative impression of him. (Caniglia Decl. Ex. 12 at Def.0637).

**I.       Kerecman Disciplined For Swearing At Another Employee**

On June 2, 2003, Kerecman was heard in the locker room telling a co-worker, Carolynne Reynolds, to "get her ass out on the fucking floor." (Kerecman Depo. at 156, 157 and Ex. 7 at Def.0781). Kerecman admitted using profane language. *Id*. at 156-59. As a result, Kerecman received a Step 1 "written consultation" for swearing at another employee. *Id*. at 158, 159, 161,

162 and Ex.7 at Def.0781. Kerecman does not believe the reason given by Pactiv for this discipline was false. (Kerecman Depo. at 162).

**J.      Kerecman Disciplined For Safety Violations**

Kerecman, like all employees, is required to abide by safety rules. (Kerecman Depo. at 162-63).  Kerecman was familiar with these safety rules. *Id*. at 162-63 and Ex. 22 at Def.0445. During the week of May 26, 2003, Kerecman was counseled on three separate days after Second Shift Supervisor Deffenbaugh observed her each time not wearing the required eye protection. *Id.* at 163, 164, 166 and Ex. 8 at Def.0782. Kerecman admits she was not wearing eye protection, but testified that she usually did wear her eye protection. *Id.* at 164. On June 3, 2003, Deffenbaugh again observed Ms. Kerecman without the appropriate eye protection. *Id*. at 164-66. He approached her to give her the appropriate eye protection (*i.e.,* side shields) and she told him, "I will start wearing those when you make your maintenance men wear glasses and ear plugs." *Id*. at 166, 167. On June 4, 2003, Deffenbaugh again observed Kerecman without the appropriate eye protection.  *Id* at 169, 170. Deffenbaugh spoke with Kerecman again about her violation of the safety rules. *Id*. at 170.  On June 5, 2003, Kerecman received a "letter of reprimand" for violating the rules. *Id*. at 165, 170 and Ex. 8 at Def.0782. In the disciplinary notice, Pactiv wrote: Kerecman "has shown a complete disregard for the requirement of wearing appropriate personal protective equipment ["PPE"].  Her continued actions of not wearing the appropriate PPE, as well as her comments to her supervisor, were insubordinate." *Id*. at 170-72 and Ex. 8 at Def.0782.  Kerecman admits she violated Pactiv's safety rules by failing to wear eye protection despite repeated warnings from her supervisor, but testified that she believes the reasons for writing her up were false.  *Id*. 171, 172.  Ms. Kerecman explained that there was a

17

maintenance man who did not wear the eye protection, but was not punished. *Id*. at 171.
Kerecman believes instead that she received the write up because Ms. Caniglia and her did not
get along and that if Caniglia "don't like you, she will do anything she can to get back at you."
*Id*. at 173.

**K.      Watkins Complains That Kerecman Is Still Harassing Him**

On June 6, 2003, Watkins again reported to Caniglia that *he* was being harassed by
Kerecman. (Caniglia Decl. ¶ 34 and Ex. 12 at Def.0637). Watkins reported that Kerecman was
writing down his license plate number from his car, truck, and his wife's car, and that he was
afraid she might show up at his house. (Caniglia Decl. Ex. 12 at Def.0637).

That same day, co-employees Edie Asbury and Beth Bentley also reported to Caniglia
that Kerecman was taking down Watkins' license plate number. (Caniglia Decl. ¶ 35 and Ex. 1 at
Def.0779-80). Asbury said she overheard Kerecman and Bird say they were going to report
Watkins to the police for following Bird home. (Caniglia Decl. Ex. 1 at Def.0779-80). They
reported that Bird was monitoring Watkins' breaks to find out when he started and returned
from his break. (Caniglia Decl. Ex. 1 at Def.0780). Bentley mentioned that she saw a sheriff's
car parked in the parking lot and thought it was parked there to scare Watkins. (Caniglia Decl.
Ex. 1 at Def.0780).

Asbury and Bentley said they saw Watkins every night, that he was doing what he was
supposed to be doing, that he was a good worker, and that he was making an effort to avoid
Kerecman and Bird. (Caniglia Decl. Ex. 1 at Def.0780).

Ms. Kerecman testified that she did not monitor Watkins' breaks. (Kerecman Depo. at
149, 182).  Kerecman admitted that she did write down the license plate numbers of Watkins car

18

and that she did give the numbers to the police. *Id.* at 172.

On June 6, 2003, Caniglia contacted the local police to report the incident involving the police car in the parking lot. (Caniglia Decl. ¶ 36 and Ex. 15 at Def.0738-042).  Kerecman admitted at her deposition she asked an officer, who was a friend, to come to Pactiv's parking lot. (Kerecman Depo. at 204, 209, 210, 211, 213, 228; *see also* SK Dep. Ex. 10, Caniglia Decl. ¶ 36 and Ex. 15 at Def.0739).  Ms. Kerecman testified that she wanted the officer to "come up so I could see her in her cruiser, you know, congratulate her . . . ."  The officer's email to Kerecman stated: "guess what I will be doing when I get out there…yeap…coming up to your work place and making my [presence] known!!!!" (Caniglia Decl. Ex. 15 at Def.0739; Kerecman Depo. at Ex. 10). The officer was reprimanded for being on the premises without official business. (*See id.*; Caniglia Decl. ¶ 36).

**L.     Kerecman Claims Watkins Threatened Her with a Gun**

On August 13, 2003, Kerecman approached Ed Seeberger ("Seeberger"), Pactiv's Operations Manager for Pressware Products. (Caniglia Decl. ¶ 37 and Ex. 1 at Def.0784; Kerecman Depo. at 20, 183-84 and Ex. 1 at Def.0440).  Kerecman told Seeberger she felt "threatened and harassed by John Watkins." (Kerecman Depo. at 22 and Ex. 1 at Def.0440; Caniglia Decl. Ex. 1 at Def.0784).  Seeberger reported to Caniglia that Kerecman told him, "John [Watkins] told me that he has a gun and will come after me if he lost his job. [Kerecman said she had contacted the police about the threat]. . . . John [Watkins] is staring at [me] constantly.

He is 'grabbing his crotch' in front of other girls and 'flipping [them] off.'" (Caniglia Decl. Ex. 1 at Def.0784; *see also* Caniglia Decl. Ex. 16 at Def.0640)

19

At her deposition, Kerecman claimed that her October 29, 2003, signed statement was accurate except for the fact that she never reported that Watkins said he had a gun. (Kerecman Depo. at 26 and Ex. 1 at Def.0440).  Kerecman claimed Seeberger may have misunderstood her when he reported that she said Watkins told her he had a gun. Kerecman believes she may have "jumbled things together as far as, you know, John has threatened me; I heard he had a gun. I mean, so maybe Ed took it out of context or ran everything together." (Kerecman Depo. at 21).

On August 19, 2003, in response to Kerecman's complaints to Operations Manager Seeberger, Caniglia met with Kerecman about the alleged threat made by Watkins. (Kerecman Depo. at 22, 29, 186, 188, 189 and Ex. 1 at Def.0440-41).  At first, Kerecman stated she did not want to talk about her conversation with Seeberger. (Kerecman Depo. Ex. 1 at Def.0440-41). After some coaxing, Kerecman finally told Caniglia about the gun threat, but initially refused to identify who had made the comment about the gun. (Kerecman Depo. at 189 and Ex. 1 at Def.0441). Then Kerecman revealed to Caniglia that Watkins did not actually make any gun threat to her, as reported by Seeberger.  Caniglia documented that Ms. Kerecman told Caniglia that it was Nappier that told Kerecman about the alleged gun threat.  Caniglia told Kerecman she would investigate her claims. (Kerecman Depo. at 190).  Kerecman testified that she never told Caniglia that Nappier notified her that Watkins had a gun.  Instead Kerecman claims she never told Caniglia who she heard it from and it was not until her deposition that Kerecman identified that it was a co-worker of hers,  Sharon Lieter.  Kerecman testified that Sharon Lieter told her that Ottis Wade told her (Lieter) that he (Wade) heard Watkins "talking in the break room that he had a gun and he knew how to use it."  (Kerecman Depo. at 24-25).

On August 19, 2003, Caniglia also met with Nappier. (Caniglia Decl. ¶ 38 and Ex.9 at

20

Def.0632). Nappier stated he never told Kerecman that Watkins had a gun. *See id*.  Finally, Caniglia spoke with Watkins who denied threatening Kerecman, grabbing his crotch or flipping people off. (Caniglia Decl. Ex. 12 at Def.0637-38).

**M.      Pactiv Disciplines Kerecman on August 29, 2003**

On August 29, 2003, Caniglia and Unit Manager Dan Lyons met with Kerecman and gave her a Step 2 "letter of reprimand" for making false complaints about the alleged "gun comment," and trying to intimidate Watkins by having a police officer/friend come to Pactiv and by continuing to bring up rumors as fact. (Caniglia Decl. ¶ 39 and Ex. 17 at Def.0790-0790.2; Kerecman Depo. Ex. 9 at Def.0788-89).  Caniglia told Kerecman that her actions during the past couple months had violated "Pactiv policies and Standards of Conduct, and [had] risen to the level of harassment." *See id*.  Caniglia reminded Kerecman that she had previously reviewed with Kerecman Pactiv's harassment policy regarding the requirement that employees make reports in "good faith." *See id*.

Caniglia then explained the basis for the "write up." First, on Wednesday, August 13, 2003, Kerecman told Seeberger that Watkins made the statement to her that "he had a gun and was coming to get [her] if he lost his job." *Id*. When Caniglia talked to Kerecman about this allegation on August 19, however, Kerecman stated that *someone else* had told her about the gun threat and identified Jeff Nappier as the individual who allegedly made this statement. *See id*. Caniglia had then spoken with Nappier who said he never made this statement to Kerecman or to anyone else. Watkins also denied making any threatening comments about a gun.  Caniglia told Kerecman there was a pattern of Kerecman making accusations about Watkins where she either

21

heard rumors or created rumors about him and reported those rumors as fact.  Caniglia stated that upon further investigation, none of the reports had been shown to be true.  As a result, Kerecman's credibility and integrity had been put in a "bad light."

Second, Caniglia told Kerecman that over the past 2-3 months, Kerecman had engaged in harassing activities.  For example, she had her friends and co-workers intimidate Watkins by "monitoring his breaks or questioning others on his whereabouts during the shift" and "[b]y writing down descriptions of his vehicles and his license plate numbers."  Kerecman also asked a friend in the sheriff's department to intimidate Watkins by parking in Pactiv's parking lot to watch him.

Caniglia reminded Kerecman that she had a history of not being able to "get along with co-workers" which included prior written warnings.  Caniglia told Kerecman she had been a "key player in spreading rumors and keeping rumors alive on [her] shift" and that this had caused "morale issues on [her] shift" and this had hurt the productivity of workers on the shift.  Caniglia informed Kerecman that this reprimand would serve as a "final warning" and that she needed to show "immediate improvement."

**N.      Kerecman Receives A Written Warning For Poor Attendance**

On September 3, 2003, Kerecman received a "letter of reprimand" for accumulating six absences during a 12-month period as of August 30, 2003. (Kerecman Depo. at 219 and Ex. 11 at Def.0791).  Kerecman acknowledges this is a violation of Pactiv's no-fault attendance policy. (Kerecman Depo. at 219, 225, 226).

**O. Kerecman's Attorney Sends Letters to Pactiv Alleging Harassment**

On September 22, 2003, Kerecman's attorney, Daniel Klos, sent a letter to Pactiv

claiming Kerecman had been subjected to sexual harassment. (Kerecman Depo. at 226, 227 and Ex. 12 at Def.0730-32). In his letter, Klos re-alleged the same claims Kerecman had previously raised earlier in the year. (Kerecman Depo. at 229). Kerecman admitted in her deposition she was not subjected to any adverse employment action after her attorney's September 22, 2003 letter (*i.e.*, no discipline, demotion, loss of pay or benefits) and that the letter was the first time Pactiv was aware that she had consulted an attorney. *Id.* at 229, 231, 233, 234. In response to Klos' letter, Caniglia reinvestigated Kerecman's claims. (Caniglia Decl. ¶ 41). On December 22, 2003, Klos sent Pactiv another letter alleging violations of the Family and Medical Leave Act. (Kerecman Depo. at 239 and Ex. 13 at Def.0728-29).

**P.     Other Alleged Harassment by Watkins**

Kerecman alleges that "[b]esides constantly staring at her Watkins did a myriad of other 'little things' to [her] that, taken together, constitute sexual harassment." (Pl.'s Memo. in Opp. at 8). In March of 2004, Kerecman claims that Watkins saw her and "made a beeline to her and came as close as he possibly could to her without actually touching her." *Id.* Additionally, for two consecutive nights in June of 2004, after Watkins had been moved to a different shift, "when Ms. Kerecman took over the machine he had worked on during second shift, the temperature of the dye was lower as if Watkins had turned off the machines to intentionally cause Ms. Kerecman to have down time." *Id.* There is no indication that Kerecman reported either of these alleged incidents.

Finally, Kerecman alleged that on one night in 2004, when she moved her car on one of her breaks, that Watkins walked up to the curb where she intended to park and did not move such that she was unable to pull into the parking space completely. *Id.* at 9. Ms. Kerecman testified

23

that she reported the incident to Joe Deffenbaugh who said he would take care of it. (Kerecman Depo. at 36).

**Q.     Kerecman's Charge of Discrimination**

On February 17, 2004, Kerecman filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging sexual harassment and retaliation. (Kerecman Depo. at 75 and Ex. 4 at Def.0756-58).  The EEOC closed its file on Ms. Kerecman's charge because it was unable to conclude that the information obtained establishes violations of the statutes.  After June 22, 2004, Plaintiff Kerecman received her right to sue letter. (Compl. ¶ 2).

## II.  SUMMARY JUDGMENT STANDARD

The standard governing summary judgment is set forth in Fed. R. Civ. P. 56(c), which provides:

> The judgment sought shall be rendered forthwith if the pleadings, Depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate, however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Matsushita Electric Industrial Co., Ltd. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must draw all reasonable inferences in favor of the nonmoving party, and must refrain from making credibility determinations or weighing the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).[1] The Court disregards all evidence favorable to the moving party that the jury would not be required to believe. *Id.* Stated otherwise, the Court must credit evidence favoring the nonmoving party as well as evidence favorable to the moving party that is uncontroverted or unimpeached, if it comes from disinterested witnesses. *Id.*

The Sixth Circuit Court of Appeals has recognized that *Liberty Lobby, Celotex,* and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identified a number of important principles applicable in new era summary judgment practice. For example, complex cases and cases involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

Additionally, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must

---

[1] *Reeves* involved a motion for judgment as a matter of law made during the course of a trial under Fed. R. Civ. P. 50 rather than a pretrial summary judgment under Fed. R. Civ. P. 56. Nonetheless, standards applied to both kinds of motions are substantially the same. One notable difference, however, is that in ruling on a motion for judgment as a matter of law, the Court, having already heard the evidence admitted in the trial, views the entire record, *Reeves*, 530 U.S. at 150. In contrast, in ruling on a summary judgment motion, the Court will not have heard all of the evidence, and accordingly the non-moving party has the duty to point out those portions of the paper record upon which it relies in asserting a genuine issue of material fact, and the court need not comb the paper record for the benefit of the nonmoving party. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). As such, *Reeves* did not announce a new standard of review for summary judgment motions.

'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id., quoting Liberty Lobby*, 477 U.S. at 257.  The nonmoving party must adduce more than a scintilla of evidence to overcome the summary judgment motion.  *Id.*  It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id., quoting Matsushita*, 475 U.S. at 586.

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* at 1479-80.  That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact.  *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

### III. DISCUSSION

Ms. Kerecman alleges that she was subject to a hostile work environment and was retaliated against in violation of Title VII of the Civil Rights Act of 1964.  Additionally, Ms. Kerecman alleges that she was subjected to intentional infliction of emotional distress.  Defendant Pactiv argues that it is entitled to summary judgment on each of Plaintiff Kerecman's claims.  *First,* as a preliminary matter, the Court will address Defendant Pactiv's request that the Court strike various facts and evidence submitted by Plaintiff in her Memorandum in Opposition.  *Second*, the Court will review Defendant Pactiv's arguments in support of its contention that it is entitled to summary judgment with respect to Ms. Kerecman's hostile environment claims.  *Third*, the Court will turn to the alleged retaliation claim.  *Finally*, the Court will address Defendant Pactiv's arguments in favor of summary judgment as they relate to Ms. Kerecman's claim of intentional infliction of emotional distress.

A.     **Defendant's Request to Strike Plaintiff's Evidence**

26

Defendant Pactiv argues that Plaintiff has sought to "bury the Court . . . with page after page of unsubstantiated, inadmissible, and immaterial allegations" in violation of the Federal and Local Rules. (Def's Reply at 1).  Consequently, Defendant Pactive requests that this Court strike or disregard: (1) "Kerecman's statements that rely on testimony that is not based on personal knowledge or lacks proper evidentiary foundation"; (2) "Kerecman's submission of facts that contain improper conclusory statements, arguments, opinion, conjecture, speculation and suggested inferences"; and (3) inadmissable hearsay statements.  *Id.* at 2.

On summary judgment, the Court should not consider conclusory statements or statements made without personal knowledge. *See, e.g., Reddy v. Good Samariton Hosp. & Health Ctr.*, 137 F.Supp.2d 948, 958 (S.D. Ohio 2001).  Likewise, "[h]earsay evidence cannot be considered on a motion for summary judgment."  *Wiley v. U.S.*, 20 F.3d 222, 226 (6th Cir. 1994).  The Court agrees with Defendant Pactiv that Plaintiff has sought to introduce a significant amount of inadmissible evidence in its Memorandum in Opposition.  In ruling on Defendant Pactiv's Motion for Summary Judgment, the Court will disregard all such evidence.[2]

**B.      Sexual Harassment / Hostile Environment**

Plaintiff Kerecman alleges that she was subjected to a sexually hostile work environment while working at Pactiv in violation of Title VII and O.R.C. § 4112.  **Defendant Pactiv argues that Ms. Kerecman cannot demonstrate an actionable hostile work environment because (1) the claims are untimely; and (2) the claims lack merit as Ms. Kerecman has failed to show that the**

---

[2]The Court also notes that Plaintiff Kerecman has failed to comply with Local Rule 7.2(a)(3) which requires Memoranda in excess of twenty pages to include a combined table of contents and summary.

**alleged conduct of co-worker John Watkins was severe or pervasive or that there is any basis for employer liability.** The Court agrees with Defendant Pactiv that Ms. Kerecman's claims for a sexually hostile work environment are untimely and also that the claims lack merit.

 

 

       1.       **Timeliness**

Defendant Pactiv argues that Kerecman's claims are time-barred because she fails to allege any act of harassment that occurred during the 300-day statute of limitations period after April 23, 2003. (Def's Mot. for Summ. J. at 22). Kerecman claims that harassment did occur after April 23, 2003, and so under the continuing violation doctrine, the Court can consider allegations which occurred earlier. This Court agrees with Defendant Pactiv that the alleged hostile environment claims are time-barred because the post-April 23 incidents Kerecman raises either lack evidentiary support or are not demonstrative of sexual harassment.

Ms. Kerecman is required by § 2000e-5(e)(1) to file her charges of unlawful practices with the EEOC within 300 days or she will lose her ability to recover for it. For purposes of determining whether a Title VII plaintiff has complied with statutory time limitations, the U.S. Supreme Court, in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), has drawn a distinction between discrete discriminatory acts and a series of separate acts that collectively constitute a hostile work environment. After analyzing the nature of hostile work environment claims, the *Morgan* Court concluded that "[i]t does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside of the statutory time

period.  *Provided that an act contributing to the claim occurs within the filing period*, the entire period of the hostile environment may be considered by the court for the purposes of determining liability." *Id.* at 117 (emphasis added).

Thus, based upon *Morgan*, this Court, in assessing the merits of Ms. Kerecman's alleged hostile environment claim, will consider *all* of the alleged incidents of harassment, including those that occurred outside of the statutory filing period (including even the earliest alleged harassment of Ms. Kerecmen in the fall of 2002), *provided that an act contributing to the sexually hostile work environment claim occurs within the filing period*.  The required "act contributing to the claim" need not be actionable on its own. *Id.* at 115, *citing Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  Further, the contributing act need not be "overtly sexual in nature," but is illegally sex-based where it evinces anti-female animus, and therefore could be found to have contributed significantly to the hostile environment." *Williams v. General Motors Corp.*, 187 F.3c 553, 560 (6th Cir. 1999).

Based upon this standard, Plaintiff Kerecman argues she has alleged four contributing acts of sex-based harassment that occurred after April 23, 2003: (1) until September, 2003, Watkins constantly stared at her; (2) in March, 2004, Watkins "made a beeline to her and came as close as he possibly could to her without actually touching her"; (3) in June, 2004, on two consecutive nights, the temperature of the dye was lower on the machines such that she was unable to immediately run her machines; and (4) in 2004, Watkins walked up to the curb where she intended to park and did not move such that she was unable to pull in the parking space completely. (*See* Pl's Memo. in Opp. at 19-20).

These four post-April 23 incidences raised by Plaintiff cannot serve to make Plaintiff's

sexual harassment claim timely because the alleged acts are either non-sexual or they lack

evidentiary support.  Plaintiff admitted at her deposition that she had no personal knowledge of

Watkins actually staring at her:

> Q.      So how do you know he's staring at you?
>
> A.      It's just a feeling you get.  You just know . . . .

(Kerecman Depo. at 51).  Plaintiff's speculation, intuition or "feelings" do not amount to

personal knowledge.  Kerecman also testified that she "did not look at John [Watkins], because I

don't want him doing to me what he did to the other women.  So I just kind of kept my back to

him and just kept my eyes on my machine." *Id*. at 50.  Thus, Kerecman's allegations of staring

lack foundation.  Additionally, the Court finds that staring alone does not constitute sex-based

harassment.  Likewise, Kerecman's allegation that Watkins walked up to the curb where she

intended to park and stood there such that she was still able to park there, but could not fully pull

in, is not demonstrative of harassing conduct based on sex.  The other two incidents occurred

*after* Kerecman filed her EEOC charge and also are not demonstrative of sexual harassment.

Additionally, Plaintiff's attempts to link her untimely claims to the alleged claims of

harassment by Watkins against other women fail because Plaintiff does not allege that she was

aware of such conduct.[3]  *See e.g., Kohler v. City of Wapakoneta*, 381 F.Supp.2d 692, 707 (N.D.

Ohio 2005) (The requirement that the environment be subjectively hostile means that [plaintiff]

may not premise a harassment claim on conduct of which she was not aware.").

Thus, Ms. Kerecman's hostile environment fails as untimely because there has not been

---

[3]Further, much of the evidence Plaintiff has sought to introduce with respect to claims of
harassment by Watkins of other women is inadmissable.

an act contributing to her alleged hostile work environment within the filing period.   The Court

continues its analysis of the merits of Plaintiff Kerecman's hostile environment claim as an

alternative basis for its grant of summary judgment in Defendant Pactiv's favor.

> **2.    Merit**

Ms. Kerecman alleges that she was subject to a sexually hostile work environment while

working at Pactiv in violation of Title VII.  **Defendant Pactiv argues that Ms.**

**Kerecman cannot demonstrate an actionable hostile work**

**environment because (1) Ms. Kerecman has failed to show that**

**the alleged conduct of co-worker John Watkins was severe or**

**pervasive; and (2) Ms. Kerecman has failed to show that there is**

**any basis for employer liability.**   The Court agrees with Defendant Pactiv.

To establish a claim under Title VII for sexual harassment based on the conduct of a

coworker, the plaintiff must demonstrate that (1) she is a member of a protected class, (2) she

was subjected to unwelcome sexual harassment, (3) the harassment was based on her sex, (4) the

harassment unreasonably interfered with plaintiff's work performance and created a hostile or

offensive work environment that was severe and pervasive, and (5) the employer knew or should

have known of the charged harassment and unreasonably failed to take prompt and appropriate

corrective action.  *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 829-30 (6th Cir. 1999); *Blankenship v.*

*Parke Care Ctrs., Inc.*, 123 F.3d 868, 872 (6th Cir.1997).  A hostile work environment occurs

"[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal

quotations and citations omitted).  Both an objective and a subjective test must be applied: the

conduct must have been severe or pervasive enough to create an environment that a reasonable

person would find hostile or abusive, and the victim must subjectively regard that environment

as having been abusive. *Id.* at 21-22.  Isolated incidents, unless extremely serious, will not

amount to discriminatory changes in the terms or conditions of employment.  *Morris v. Oldham*

*County Fiscal Court*, 201 F.3d 784, 790 (6th Cir. 2000).  Appropriate factors for the court to

consider when determining whether conduct is severe or pervasive enough to constitute a hostile

work environment include:

1.    the frequency of the discriminatory conduct;

2.    the severity of the discriminatory conduct;

3.    whether the discriminatory conduct is physically threatening or
      humiliating, or a mere offensive utterance;

4.    whether the discriminatory conduct interferes with an employee's work
      performance; and

5.    whether the plaintiff actually found the environment abusive.

*Id.* at 21-22; *see also Bowman v. Shawnee State Univ.*, 220 F.3d 456, 463 (6th Cir. 2000) (reciting

factors from *Harris*).  The Court has explained:

> Title VII does not prohibit "genuine but innocuous differences in the ways men
> and women routinely interact with members of the same sex and of the opposite
> sex." *Oncale*, 523 U.S., at 81.  A recurring point in these opinions is that "simple
> teasing," *id.*, at 82, offhand comments, and isolated incidents (unless extremely
> serious) will not amount to discriminatory changes in the "terms and conditions of
> employment."  These standards for judging hostility are sufficiently demanding to
> ensure that Title VII does not become a "general civility code." *Id.*, at 80.
> Properly applied, they will filter out complaints attacking "the ordinary
> tribulations of the workplace, such as the sporadic use of abusive language,
> gender-related jokes, and occasional teasing." B. Lindemann & D. Kadue, *Sexual*
> *Harassment in Employment Law* 175 (1992) (hereinafter Lindemann & Kadue)
> (footnotes omitted). We have made it clear that conduct must be extreme to

> amount to a change in the terms and conditions of employment, and the Courts of Appeals have heeded this view. *See, e.g., Carrero v. New York City Housing Auth.*, 890 F.2d 569, 577-578 (C.A.2 1989); *Moylan v. Maries County*, 792 F.2d 746, 749-750 (C.A.8 1986); *See also* 1 Lindemann & Grossman 805-807, n. 290 (collecting cases granting summary judgment for employers because the alleged harassment was not actionably severe or pervasive).

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

In the instant case, the Court has reviewed the evidence Plaintiff Kerecman has submitted, and concludes that even when the evidence is viewed in the light most favorable to her, Plaintiff has fallen far short of demonstrating that she was subjected to a hostile work environment.

Mr. Watkins' alleged actions towards Ms. Kerecman do not meet the "severe and pervasive" requirement for unlawful harassment. Plaintiff Kerecman has alleged that for approximately three months, Watkins repeatedly asked her out after she told him no, but that she did not report it to management until the cornering incident. Kerecman admitted that Watkins did, in fact, stop asking her out and "basically stopped talking to" her after she reported him for the cornering incident. (Kerecman Depo. at 93). After this, Kerecman alleged Watkins engaged in other non-sexual incidents such as staring at her and once grabbing packing trays from her and slamming them into the plastic bag. Kerecman reported Watkins and told the supervisor she wanted Watkins moved. The supervisor immediately accommodated Ms. Kerecman's wishes and Mr. Watkins was moved. *Id*. at 84. Finally, Ms. Kerecman testified that after Mr. Watkins was moved, Mr. Nappier told her that Mr. Watkins had told him that he would

33

come back and hurt Ms. Kerecman if he lost his job. *Id*. at 71-73.  Ms. Kerecman admits that she did not immediately report this alleged threat to management. *Id*. at 73.  Ms. Kerecman testified that despite John Watkins' behavior, that she was still "able to do [her] job" and that she was "an above average worker." *Id*. at 265-266.

The Court finds that these incidents do not amount to discriminatory changes in the terms or conditions of Plaintiff's employment.  Accordingly, Defendant Pactiv is entitled to summary judgment on Plaintiff's sexually hostile work environment claim because the alleged harassment is not actionably severe and pervasive.

Moreover, Defendant Pactiv has an affirmative defense against Plaintiff's sexual harassment claim for a hostile environment.  Ms. Kerecman alleges that the hostile environment was created by the conduct of her co-worker, Mr. Watkins.  The standard for examining an employer's conduct in connection with co-worker harassment is that of reasonableness.  *Fenton*, 174 F.3d at 829.  Thus, when an employer responds to charges of co-worker sexual harassment, the employer can be liable only if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868, 872-73 (6th Cir.1997), *cert. denied*, 522 U.S. 1110 (1998).

Defendant Pactiv had a policy to prevent and correct sexual harassment.  The policy requires all Pactiv employees who believe they have been the

subject of unlawful harassment to report the alleged act immediately to the Facility Manager, his

or her supervisor, his or her Employee Relation's Manager or to the Corporate hotline.

Additionally, Pactiv also maintains

Standards of Conduct within the workplace which employees are required to follow.  Standards

of Conduct No. 6 prohibits "the making of obscene or abusive remarks on Company time,

Company property, or Company business."

Plaintiff Kerecman received copies of the Employee Handbook and Pactiv's Sexual

Harassment Policy.  In her deposition, Kerecman admitted that she believes Pactiv takes "all

allegations of harassment seriously" and upon apprisal of a complaint of harassment would

investigate.  (Kerecman Depo. at 252-253).  Plaintiff further admitted that she did not believe

that Pactiv's sexual harassment policy was ineffective. *Id*. at 253.

Pactiv's response to Ms. Kerecman's reporting of Watkin's alleged sexual harassment

did not manifest indifference or unreasonableness in light of the facts that Pactiv knew.

Kerecman did not speak to anyone in management about Watkins repeatedly asking her out until

after the alleged January, 2003 cornering incident.  She reported the incident to Mike Diaz and

requested that Watkins be moved for the night.  Per Kerecman's request, Watkins was moved.

In addition, Ron Poe, the supervisor spoke with Watkins and reported back to Ms. Kerecman that

she would be left alone.  Ms. Kerecman admits that Mr. Watkins did, in fact, stop asking her out

and "basically stopped talking to" her after this incident. *Id*. at 93.  Similarly, Ms. Kerecman's

requests that Watkins be moved after the alleged tray-slamming incident were accommodated.

Ms. Kerecman's April 29, 2003 meeting with Joe Deffenbaugh about Watkins immediately

spurred an investigation by Pactiv that entailed a total of twelve employees being interviewed by

35

Toni Caniglia and resulted in Watkins receiving a verbal warning, counseling, review of Pactiv's

sexual harassment policy and a letter regarding the meeting placed in his personnel file.

Significantly, Kerecman admitted when interviewed in May, and again in October, 2003, that

Watkins had stopped bothering her.  (Kerecman Depo. at Ex. 1).

Based on the foregoing, the Court finds that Plaintiff Kerecman is unable to establish a

claim for sexual harassment based on the conduct of her co-worker, John Watkins, because she

cannot demonstrate that Pactiv unreasonably failed to take prompt and appropriate corrective

action.  **For this additional reason, Defendant Pactiv is entitled to**

**summary judgment in its favor on Ms. Kerecman's sexually**

**hostile work environment claim.**

**C.      Retaliation**

As a preliminary matter, Plaintiff Kerecman, in her Memorandum in Opposition,

"voluntarily dismisses with prejudice her retaliation for hiring an attorney claim" (Count Four).

(Memo. in Opp. at 48).  Ms. Kerecman's Count Five retaliation claim remains.

Defendant Pactiv argues that Plaintiff Kerecman cannot establish a *prima facie* case of

retaliation because she cannot state an adverse employment action and also because she cannot

establish the necessary causal link between the alleged acts of retaliation and her protected

activity.  Pactiv further argues that it had legitimate, non-retaliatory reasons for all of its actions

regarding Kerecman and that she cannot establish that such actions are pretextual.  This Court

agrees.

Title VII prohibits an employer from retaliating against an employee who "made a

charge, testified, assisted, or participated in any manner in an investigation, proceeding, or

36

hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  The elements of *prima facie* case of

retaliation are:

> (1) that he engaged in activity protected by Title VII; (2) that the defendant knew
> of this exercise of his protected rights; (3) that the defendant consequently took an
> employment action adverse to plaintiff; and (4) that there is a causal connection
> between the protected activity and the adverse employment action.

*Stouss v. Michigan Dept. of Corrections*, 250 F.3d 336, 342 (6th Cir. 2001); *see also Jackson v.*

*Pepsi-Cola, Dr. Pepper Bottling Co.*, 783 F.2d 50, 54 (6th Cir. 1986) *cert. denied*, 478 U.S. 1006

(1986).  A plaintiff may satisfy the participation element of a *prima facie* case for retaliation by

showing he reasonably believed his activity was protected.  *See Johnson v. Univ. of Cincinnati*,

215 F.3d 561, 582 (6th Cir. 2000).

     If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to

come forward with a legitimate, non-discriminatory and non-retaliatory reason for the adverse

action against the plaintiff.  *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 506-507 (1993);

*Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981).  If the defendant comes

forward with a legitimate, non-discriminatory and non-retaliatory reason for its actions, then the

burden shifts to the plaintiff to prove that the defendant's proffered reason is a mere pretext for

discrimination or retaliation.  *Hicks*, 509 U.S. at 512 n. 4; *Burdine,* 450 U.S. at 253.  "The nature

of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate

and intermediate burdens.  The ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated [or retaliated] against the plaintiff remains at all times with the

plaintiff."  *Burdine* at 253.

     Plaintiff Kerecman claims that she "engaged in protective activity in the complaint

process opposing discrimination and acting as a witness to confirm complaints of discrimination

and suffered adverse action by being subjected to a hostile work environment . . . ." (Complaint ¶ 38).  Kerecman claims five acts of retaliation: (1) being written up for using profanity; (2) being reprimanded for safety violation; (3) being threatened with her job if she did not sign a harassment form that had been distributed; (4) not being given an additional two weeks of leave following hernia surgery.  (*See* Pl's Memo. in Opp. at 46-48).

The Court finds that none of these alleged acts of retaliation create a genuine issue of material fact as to whether Ms. Kerecman suffered an adverse employment action as is required to assert a retaliation claim.  The Sixth Circuit has defined an adverse employment action as a "materially adverse change in the terms and conditions of [plaintiff's] employment because of [the] employer's conduct." *Smith v. City of Salem*, 378 F.3d 566, 575 (6th Cir. 2004), *quoting Hollins v. Atlantic Co.*, 188 F.3d 652, 662 (6th Cir. 1999); *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996).  "[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. *Hollins*, 188 F.3d at 662.  "Examples of adverse employment actions include firing, failure to promote, reassignment with significantly lower responsibilities, a material loss of benefits, suspensions, and other indicies unique to a particular situation."  *Smith,* 378 F.3d at 575-76, *quoting Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *See also, Plautz v. Potter*, 156 Fed.Appx. 812, 817 (6th Cir. 2005),  *citing Hollins*  188 F.3d at 662 ("[Employer's] threats to discharge or discipline [employee] were not adverse employment actions because it is settled in this circuit that a threat to discharge is not an adverse employment action.").  Applying the foregoing law, this Court finds that none of the alleged retaliatory actions amounted to materially adverse changes in the terms and conditions of Kerecman's employment.

Consequently, Defendant Pactiv is entitled to summary judgment in its favor with respect to Plaintiff's retaliation claim.

Plaintiff Kerecman's retaliation claim fails for the additional reasons that Plaintiff cannot establish the requisite causal link for a *prima facie* case and also because Kerecman is unable to show that Pactiv's proffered non-retaliatory reasons for its actions are a mere pretext for retaliation. To establish the causal connection required in the third prong, a plaintiff must adduce "sufficient evidence from which an inference could be drawn that the adverse action would not have been taken" but for the plaintiff's participation in a protected Title VII activity. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). The Sixth Circuit noted:

> Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation.

*Nguyen*, 229 F.3d at 563.

In the instant case, Plaintiff Kerecman fails to present evidence sufficient to permit an inference that any of Pactiv's four alleged retaliatory actions would not have been taken but for her participation in Pactiv's complaint process.

*First*, Plaintiff contends that when she was disciplined in 1998 for swearing, that only an "internal memorandum" was issued as compared with the "written consultation" that was issued in June, 2003. Defendant Pactiv points out that Plaintiff Kerecman has mischaracterized the evidence and that Plaintiff was issued a written consultation in both 1998 and 2003. Kerecman also claims that she was disparately disciplined for using profanity on June 4, 2003, but fails to identify any other employees who Pactiv knew used profanity and did not discipline. In fact, Pactiv has similarly disciplined other employees for profanity. (Caniglia's Supp. Decl. ¶ 7).

Thus, Kerecman has failed to establish the requisite causal link.  Additionally, Kerecman, at her deposition, admitted using profane language and testified that she does not believe the reason given by Pactiv for this discipline was false. (Kerecman Depo. at 156-159 and 162).  This Court therefore finds that the reasons given by Defendant Pactiv for the discipline were not pretext for retaliation.

*Second,* Kerecman claims that she was disparately disciplined for not wearing eye protection, unlike Wayne Plot.  Kerecman has failed, however, to present evidence that he was similarly situated to Kerecman.  That is, Kerecman has not presented evidence that Wayne Plot refused to wear the eyewear after being observed and warned on four separate occasions over the course of 3-4 days for failing to wear the proper eye protection in violation of Pactiv's safety rules.  Pactiv points out that a male employee on December 11, 2002, and another female employee on July 2, 2003 also received "write ups" for the same safety violations.  Again, this Court finds that Plaintiff has failed to establish the requisite causal link and also failed to demonstrate pretext.

*Third*, Ms. Kerecman claims that she was threatened with her job if she did not sign a form acknowledging that she received a copy of Pactiv's harassment policy that was being distributed.  This alleged retaliatory act occurred in March of 2004, after she had filed her EEOC charge and, as such, is beyond the scope of her underlying EEOC charge.  *See e.g.*, *Woodford v. Warrensville Developmental Ctr.*, 35 F.3d 567 at *1 (6th Cir. 1994).  Even so, no adverse action actually occurred and Plaintiff has not alleged that others similarly situated did not have to sign the acknowledgment forms.

*Fourth and finally*, Plaintiff Kerecman argues that Defendant Pactiv discriminated

against her by not granting her request for an additional two weeks of leave following hernia surgery.  In November, 2003, Kerecman had hernia surgery and her physician placed her off work for four weeks.  At the end of the four weeks, Kerecman was still in pain and wanted an additional two weeks off work.  Kerecman asked Defendant to contact her physician.  Ms. Kerecman's physician cleared her to return to work.  When Kerecman went back to work, she testified that she did nothing for two weeks and that her co-workers covered for her.  Kerecman does not allege that she was punished or disciplined for doing nothing for those two weeks. Defendant argues that any claim she had about being unable to work should have been addressed with her physician who released her to work.  Kerecman admitted in her deposition that she did not call or go see her physician after he released her.  Kerecman also complains that she was not scheduled to see the company physician before returning to work.  She admitted in her deposition, however, that she did not request to see the company physician.  The Court finds that Plaintiff has failed to show that she would have been granted her request for additional leave absent her complaints about Watkins.  Further, Plaintiff Kerecman is unable to demonstrate that Pactiv's reasons for the denial – that Plaintiff's doctor cleared her for return – was not the true reason Plaintiff was not given additional time off.

In conclusion, the Court finds that Plaintiff Kerecman has failed to adduce evidence to support a *prima facie* case of retaliation sufficient to withstand Defendant Pactiv's summary judgment motion.  Additionally, Plaintiff Kerecman's retaliation claims must fail because Plaintiff is unable to show that Defendant Pactiv's proffered non-retaliatory reasons for its actions are a mere pretext for retaliation.  Defendant Pactiv is therefore entitled to summary judgment in its favor on Plaintiff Kerecman's Title VII retaliation claim.

**D.       Intentional Infliction of Emotional Distress ("IIED")**

Plaintiff Kerecman, in her Complaint, alleged IIED when Watkins' allegedly cornered her. (Complaint ¶ 42).  Similarly, when Kerecman was asked about her IIED claim at the deposition, she testified that the claim was based on Watkins' extreme and outrageous behavior. (Kerecman Depo. at 79-80).  In Plaintiff's Memorandum in Opposition, however, Plaintiff alleges for the first time that *Ms. Caniglia*, not Watkins, subjected her to extreme and outrageous conduct.  (*See* Pl's Memo. in Opp. at 48-49).  To support her claim that Ms. Caniglia subjected her to IIED, Plaintiff Kerecman contends: (1) she was unfairly disciplined; (2) Ms. Caniglia misrepresented Kerecman's job duties when speaking to Kerecman's physician; and (3) Ms. Caniglia promoted a hostile environment with her dismissive attitude towards Kerecman's complaints about Watkins. *See id*.  In response, Defendant contends these alleged actions do not equate to "extreme and outrageous" conduct under Ohio law, that Plaintiff did not suffer severe emotional distress, and that Plaintiff Kerecman has relied on inadmissible and inaccurate hearsay evidence with respect to Ms. Caniglia's alleged interactions with Kerecman's physician.

Ohio recognizes a cause of action for intentional infliction of emotional distress. *Yeager v. Local Union 20*, 453 N.E.2d 666, 671 (Ohio 1983); *Crawford v. ITT Consumer Financial Corp.*, 653 F. Supp. 1184, 1192 (S.D. Ohio 1986).  In *Yeager*, the Ohio Supreme Court expressly adopted the view of IIED set forth in Section 46 of the Restatement (Second) of Torts. *Yeager*, 453 N.E.2d at 671.  Defendant's conduct must be "extreme and outrageous" for plaintiff to assert an IIED cause of action.  *Id*.  *Yeager* specifically adopted the standard set forth in comment d to Section 46 for determining whether the "extreme and outrageous" requirement has been met:

42

> . . . It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Yeager*, 453 N.E.2d at 671; *Crawford*, 653 F. Supp. at 1192. This standard applies in the employment context. *Id.*

As set forth *supra*, the Court has found that Defendant Pactiv had legitimate reasons for disciplining Plaintiff.  In addition, the Court finds that the allegations that Ms. Caniglia misrepresented Kerecman's job duties to Kerecman's physician are inadmissible because they are based on hearsay evidence. *Wiley,* 20 F.3d at 226 (6th Cir. 1994) ("Hearsay evidence cannot be considered on a motion for summary judgment.")**.**  Even so, Ms. Caniglia's alleged behavior does not rise to the level of "extreme and outrageous" as is required by Ohio law to assert an IIED claim.  Finally, the Court finds Ms. Kerecman's assertion that Ms. Caniglia promoted a hostile environment with her dismissive attitude, to be in contradiction with the evidence.

Consequently, the Court finds that, as a matter of law, none of the conduct attributed to Ms. Caniglia and Defendant Pactiv was "extreme and outrageous" for purposes of an IIED claim under Ohio law.  **Defendant Pactiv is therefore entitled to summary judgment in its favor on Plaintiff Kerecman's IIED claim.**

## V.  CONCLUSION

Based on the foregoing, the Court **GRANTS** Defendant Pactiv's summary judgment

motion (Doc. 25). Plaintiff's sexually hostile work environment, retaliation and intentional infliction of emotional distress claims are hereby dismissed with prejudice.

The Clerk shall remove this case from the Court's pending cases list.

The Clerk shall remove Document 25 from the Court's pending motions list.


**IT IS SO ORDERED.**


  **/ s/ George C. Smith**          
**GEORGE C. SMITH, JUDGE**
**UNITED STATES DISTRICT COURT**